## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ADVANCED PHYSICAL THERAPY, LLC, ZACHARY BALL, TODD LINEBARGER, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 6:20-cv-03043-RK |
| | ) | |
| v. | ) | |
| | ) | |
| APEX PHYSICAL THERAPY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court are Defendant Apex Physical Therapy's motions for summary judgment on Counts I, II, and III of Plaintiffs Advanced Physical Therapy, Zachary Ball, and Todd Linebarger's First Amended Complaint. (Docs. 120, 122, 124.) The motions are fully briefed. (Docs. 121, 123, 125, 126, 143, 144, 145, 148, 159, 160, 161.) Also before the Court is Defendant's motion to exclude expert testimony of Brittany Hopp (Doc. 128), which is fully briefed. (Docs. 129, 136, 153.) After careful consideration and for the reasons explained below, it is **ORDERED** that: (1) Defendant's motions for summary judgment on Counts I and II (Docs. 120, 122) are **GRANTED**; (2) Defendant's motion to exclude expert testimony of Brittany Hopp (Doc. 128) is **DENIED**; and (3) Defendant's motion for summary judgment on Count III (Doc. 124) is **DENIED**.

## Background

This is a civil action involving claims of malicious prosecution, abuse of process, and computer tampering in violation of Missouri law. Plaintiffs Advanced Physical Therapy, LLC ("Advanced"), Zachary Ball ("Ball"), and Todd Linebarger ("Linebarger") bring this action against Defendant Apex Physical Therapy, LLC ("Apex"). Plaintiffs' malicious prosecution and abuse of process claims stem from a 2017 lawsuit Apex filed against Plaintiffs in Illinois state court for breach of contract and tortious interference with business expectancy, among other claims.

Apex is an Illinois limited liability company that runs a network of physical therapy rehabilitation locations for various industrial clients or facilities. In December 2016, Apex had two facilities in southwest Missouri, located in Springfield and Monett.[1]

Advanced, established in July 2016, is a Missouri limited liability company providing physical therapy services in northwest Arkansas. Ball is the Chief Executive Officer and sole owner of Advanced. Linebarger is Advanced's Director of Business Development. Advanced opened its first facility in Rogers, Arkansas. In December 2016 this was Advanced's only facility, although it has since expanded throughout the region including into southern Missouri. Ball and Linebarger both reside in Missouri.

On April 30, 2007, Ball began working at Apex as a licensed physical therapist. Ball worked at Apex's Springfield location and was the regional manager for Apex's southwestern Missouri region (encompassing Apex's Springfield and Monett locations). Linebarger began working part-time at Apex's Springfield location in January 2015 in marketing and as a technician. Prior to joining Apex, Linebarger (who is Ball's brother-in-law) did not have any experience in the physical therapy industry but he did have some prior experience in marketing. (Doc. 148-14 at 4.)

On February 3, 2015, Ball signed an Employment Agreement with Apex. The Employment Agreement included a confidentiality provision stating, he "will not make personal use of, nor disclose to any person or entity, any Confidential Information relating to [Apex]." The agreement defined "Confidential Information" to mean:

> Manuals, processes, methods, techniques, templates, documents, electronic files, contracts, Referral Sources (as defined below), projected results, supplier lists (including existing and potential supplier information), pricing, marketing, computer programs, skills, performance specifications, technical and other data, designs, schematics, equipment, set-up, billing, samples, products and services information (including information regarding all existing products and services and any future or planned products or services), financial information and results and other information and know-how relating to or useful in the business or operations of any of the APEX Related Parties.

The agreement also included a "Non-Solicitation of Referral Sources" provision:

> For a period of two (2) years after the expiration or termination of Employee's employment with the Employer for any reason, and whether voluntary or

[1] While Apex primarily has facilities in Missouri, its principal place of business is in Highland, Illinois.

2

involuntary and whether for cause or without cause, Employee will not, directly or indirectly, solicit, and will not directly or indirectly contact any existing Referral Source or identified prospective Referral Source with whom Employee has had direct or indirect contact or about whom Employee has learned confidential information and/or trade secrets by virtue of his/her employment with Employer, other than Referral Sources that Employer has not had contact with within the two (2) years immediately preceding the expiration or termination of my employment with Employer. A "**Referral Source**" is a person or entity which refers or can refer patients to Employer, such as a physician, a hospital, a physician assistant, a nurse practitioner, a nurse case manager, or a business.

Linebarger also signed a confidentiality agreement with the same confidentiality provision as Ball's employment agreement. (Doc. 126-9 at 24.) Both agreements signed by Ball and Linebarger also included a provision regarding any breach of the agreement: "In the event of my actual or threatened breach or default of this Agreement, Employer shall be entitled to an ex parte injunction (without notice to or service of process upon Employees) restraining Employee from any such actual or threatened breach or default."

Ball left Apex on August 12, 2016, followed by Linebarger five days later on August 17, 2016. Around that time, Linebarger texted an administrative assistant at Apex, saying that they were "coming back to Springfield with a vengeance."

From 2014 to 2017, one of Apex's most important customers was Prime, Inc. Apex considered Prime, a company in the trucking industry, to be a "referral source" as defined in the Agreements. Ball and Linebarger had been Prime's primary points of contact with Apex. While working at Apex, Linebarger became friends with Apex's contact at Prime, Matt Rachel.

On February 29, 2016, Prime wrote a testimonial regarding the physical therapy services provided by Apex. This testimonial was regarded as important for Apex's entry and expansion as a physical therapy service provider in the trucking industry. Seven months later, in September 2016 – and just one month after Ball and Linebarger had left their employment at Apex – Apex saw a nearly identical testimonial from Prime on Advanced's website. Apex was concerned that whatever interactions or communication Ball and Linebarger had with Prime could adversely impact Apex's relationship with the trucking company. (Doc. 126-14 at 6.) And in fact, the contract Apex then had with Prime expired on February 28, 2017, after Prime did not renew the contract. The non-renewal letter from Prime stated that the reason for the expiration of the contract was the company had decided to align its post-offer physical practices with its on-site doctor's office. (Doc. 148-2 at 19.)

Apex also had a long-standing relationship (since 2005) with Tyson Foods' Monett, Missouri, facility ("Tyson-Monett"). (Doc. 126-41 at 2.) In 2011, Apex had submitted a proposal to provide its services at Tyson Foods' Noel, Missouri, facility ("Tyson-Noel").[2] While he was working at Apex, Ball was the main point of contact for Tyson as he spoke with Tyson supervisors and visited and treated patients at the Tyson-Monett facility.

After Ball and Linebarger left Apex and opened Advanced in Arkansas, Apex learned Ball and Linebarger had been in contact with Tyson facilities in the region. In November 2016, Linebarger contacted the Tyson-Noel facility as well as a Tyson Foods' facility in Berryville, Arkansas ("Tyson-Berryville") to discuss Advanced providing on-site physical therapy at those locations. Ball followed up a few months later.

Following their departure from Apex, Apex learned Ball and Linebarger had opened Advanced and had begun providing physical therapy services in northwest Arkansas and it believed the contacts Ball and Linebarger had with Tyson and Prime after leaving Apex was to procure business for Advanced. (Doc. 126-14 at 7, 9-10.)

Before taking legal action, Apex contacted the Tyson-Berryville facility itself. Apex had been "looking into" and had "planned" to expand into northwest Arkansas, although at the time it initiated a lawsuit against Plaintiffs, Apex did not have any locations in Arkansas. Apex viewed its expansion within southwest and northwest Arkansas as a means to further serve Tyson's facilities beyond the Tyson-Monett facility. (Doc. 126-40 at 4.) However, Apex was not aware of any specific examples of lost business, or that Apex had been directly damaged or injured by Advanced, Ball, or Linebarger's actions. (Docs. 148-12 at 20; 148-40 at 8.)

On December 16, 2016, Apex filed a five-count complaint in Illinois state court against Ball, Linebarger, and Advanced for breach of contract, tortious interference with business relations, and conspiracy (the "Illinois Lawsuit"). (Doc. 126-1 at 3-13.) Three days later, on December 19, 2016, the Illinois state court issued three summonses to be served on Ball, Linebarger, and Advanced. After a private process server was appointed on December 29, 2016, Plaintiffs were served in Missouri on January 10, 2017. On February 7, 2017, Plaintiffs (as the defendants in the Illinois Lawsuit) removed the case to the United States District Court for the

---

[2] It is not clear in the summary judgment record what the outcome was, although it is apparent Apex did not ever provide services to the Tyson-Noel facility.

Southern District of Illinois. *See Apex Physical Therapy, LLC v. Ball*, No. 17-cv-00119-JPG-DGW, 2017 WL 3130241 (S.D. Ill July 24, 2017).

On April 18, 2017, Ball and Linebarger filed a declaratory judgment and injunctive relief action against Apex in Missouri state circuit court. They asked the Missouri court to declare as invalid and unenforceable the restrictive covenants in the employee agreements they had signed while working at Apex. The declaratory judgment action was removed to the United District Court for the Western District of Missouri, Case No. 6:17-cv-03149-BP, and was subsequently transferred to the Southern District of Illinois. *See Advanced Physical Therapy, LLC v. Apex Physical Therapy, LLC*, 2017 WL 9717215 (W.D. Mo. July 6, 2017). On June 25, 2017, the two cases were consolidated in the Southern District of Illinois.

On March 29, 2018, Apex amended its complaint to add additional breach of contract claims. Six months later, on October 1, 2018, Apex caused a subpoena to be issued to Victor Zuccarello to appear for a deposition in St. Louis, Missouri, to be conducted later the same month on October 26, 2018. The next day, on October 2, 2018, the district court granted, in part, Ball and Linebarger's motion for summary judgment on their counterclaims. *See Apex Physical Therapy*, 2018 WL 4737053 (S.D. Ill. Oct. 2, 2018). The court held as invalid and unenforceable the confidentiality provision of the employment agreements and ordered that the breach of contract claims be narrowed to "apply no longer to any alleged breaches of the aforementioned confidentiality provisions." *Id.* at *3-4.

On October 9, 2018, Apex caused an additional subpoena to be issued to the corporate representative of a company, Avansic, for a deposition in Tulsa, Oklahoma, to be conducted on the same day as the other scheduled depositions (October 26, 2018). Six days later, on October 15, 2018, Apex caused three subpoenas to issue to Carr Athletic Performance & Physical Therapy and Cory and Jill Carr for a deposition in Orem, Utah, to be conducted on the same day as the other scheduled depositions. (Advanced contends the information and discovery sought through all of these depositions pertained only to the portion of the litigation involving the confidentiality provision.)

On February 12, 2019, the district court granted Advanced, Ball, and Linebarger's motion for summary judgment as to the remaining claims. *Apex Physical Therapy*, 2019 WL 571031 (S.D. Ill. Feb. 12, 2019.) The court held Ball did not breach his employment contract with Apex and "the undisputed record shows that APEX did not have a reasonable expectancy of entering

into a valid business relationship with the Tyson Foods locations in Arkansas and Noel, Missouri." *Id.* at *4.

Plaintiffs filed the instant lawsuit against Apex in Missouri state court on January 3, 2020. (Doc. 1-1.) Apex removed the action to this Court on February 7, 2020, based on this Court's diversity of citizenship jurisdiction under 28 U.S.C. §§ 1332 and 1441. (Doc. 1.) Plaintiffs filed an Amended Complaint on March 6, 2020, asserting claims against Apex for malicious prosecution and abuse of process regarding the Illinois Lawsuit Apex instituted against them, and a separate claim for computer tampering in violation of Missouri law. (Doc. 16.) Apex now moves for summary judgment on all three counts.

### Standard of Review

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). A fact is material in this context when it "might affect the outcome of the suit under the governing law" and a genuine dispute is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A moving party is 'entitled to judgment as a matter of law' if the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (other citation omitted). In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Id.* (quotation marks and citation omitted). At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see* Fed. R. Civ. P. 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse

party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

## Discussion

### I.    Count I – Malicious Prosecution

In Count I of the Amended Complaint, Plaintiffs assert a claim against Apex for malicious prosecution regarding the Illinois Lawsuit. Plaintiffs allege Apex did not have probable cause to assert any of the three claims raised against them in the Illinois Lawsuit (breach of contract, tortious interference, and conspiracy), that Apex brought the lawsuit with malice, and Plaintiffs suffered damages including attorney's fees, litigation expenses, loss of revenue and business opportunity, among others. (Doc. 16 at 14.) Apex argues it is entitled to summary judgment because it reasonably believed it had a basis to file the lawsuit and Plaintiffs have failed to show they suffered special injury (as required for a malicious prosecution claim under Illinois law).

Generally, a federal court sitting in diversity jurisdiction applies the substantive law of the forum state (here, Missouri). *Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014). Under Missouri law, a claim for malicious prosecution requires proof that: (1) an earlier suit was commenced against the party, (2) the suit was terminated in the party's favor, (3) the filing party lacked probable cause for filing the suit, (4) malice in the filing party, and (5) the party sustained damages. *See, e.g.*, *Hobbs v. Consol. Grain & Barge Co.*, 517 S.W.3d 7, 9-10 (Mo. Ct. App. 2016). In this context, probable cause means the filing party had a reasonable belief in both the underlying facts and the claims asserted against the opposing party (i.e., the original defendant and the subsequent malicious prosecution plaintiff).[3] *See, e.g.*, *Impey v. Clithero*, 553 S.W.3d 344,

---

[3] Both Apex and Plaintiffs rely on Missouri law regarding the probable cause element of Plaintiffs' malicious prosecution claim (Plaintiffs after conducting a choice-of-law analysis). As Apex points out in its motion for summary judgment, however, no conflict exists between Missouri and Illinois law as to the probable cause element of a malicious prosecution claim. *See, e.g.* *Davis v. World Credit Fund I, LLC*, 543 F. Supp. 2d 953, 956 (N.D. Ill. 2008) (under Illinois law, "[i]n a civil malicious prosecution claim, probable cause is defined as 'such a state of facts as would lead a person of ordinary caution and prudence to believe that he has a justiciable claim to prosecute against the defendant.'") (citation omitted). Unless a "true conflict" exists on a pertinent issue, no choice-of-law analysis is required. *See Bacon v. Liberty Mut. Ins. Co.*, 688 F.3d 362, 366 (8th Cir. 2012); *Rangeline Capital, LLC v. Preston*, No. 4:16-CV-1428-SNLJ, 2018 WL 2321097, at *3 (E.D. Mo. May 22, 2018) (because no conflict between Missouri and Tennessee law as

353 (Mo. Ct. App. 2018) (probable cause to file a civil action is established if "it appears that a reasonably prudent person would have believed and acted under the circumstances as did the person who instigated the previous action") (citation and quotation marks omitted); *see also Hutchison v. Texas Cty., Mo.*, No. 09-3018-CV-S-RED, 2010 WL 11509270, at *7 (W.D. Mo. Dec. 1, 2010) (in a malicious prosecution action, probable cause for the initial suit means "'a belief in the facts alleged, based on sufficient circumstances to reasonably induce such belief by a person of ordinary prudence in the same situation, plus a reasonable belief by such person that under such facts the claim may be valid under the applicable law'") (quoting *Kelley v. Kelly Res. Grp., Inc.*, 945 S.W.2d 544, 549 (Mo. Ct. App. 1997)). Dismissal of the underlying action against the initial plaintiff does not by itself establish a lack of probable cause in a subsequent malicious prosecution action. *Crawford v. Ryan*, No. 12-6068-CV-SJ-REL, 2013 WL 2319360, at *5 (W.D. Mo. May 28, 2013). The dispositive inquiry is "whether under the facts as they reasonably appeared at the time the suits were filed [initial plaintiffs] had a reasonable basis to believe the claim [asserted] was valid." *McAninch v. Traders Nat'l Bank of Kansas City*, 779 F.2d 466, 470 (8th Cir. 1985) (citations omitted).

Finally, a claim for malicious prosecution requires proof that the initial plaintiff lacked probable cause for the *entire* proceeding. *Joseph H. Held & Assoc., Inc. v. Wolff*, 39 S.W.3d 59, 63 (Mo. Ct. App. 2001). In other words, a malicious prosecution plaintiff "must show a lack of probable cause for each claim." *Heberlie v. Harriman Oil Co., LLC*, 497 S.W.3d 886, 890 (Mo. Ct. App. 2016) (citation omitted); *see Zahorsky v. Friffin, Dysart, Taylor, Penner & Lay, P.C.*, 690 S.W.2d 144, 151 (Mo. Ct. App. 1985). It follows, then, a malicious prosecution defendant (or the plaintiff in the initial action) is entitled to summary judgment in the subsequent action when the undisputed facts show the malicious prosecution plaintiff "would be unable to establish a lack of probable cause" regarding one of the claims asserted in the initial lawsuit. *Heberlie*, 497 S.W.3d at 891. Thus, if a malicious prosecution defendant (here, Apex) establishes the undisputed facts show it had probable cause as to even one claim asserted in the initial lawsuit, it is entitled to

---

to breach-of-contract element of whether the parties entered an enforceable contract, the Court did not apply a choice-of-law analysis but instead looked to Missouri law as the forum state); *Smith v. Aqua-Care Marketing, LLC*, No. 6:15-CV-03489-BCW, 2017 WL 5957814, at *3 (W.D. Mo. Jan. 31, 2017); *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400, 1404 (N.D. Iowa Mar. 31, 1995) (collecting cases). Thus, as to the probable cause element, the Court will look to Missouri law, as the law of the forum state. No choice-of-law analysis is necessary at this point in the analysis.

summary judgment. "Where there is no dispute as to the facts underlying a claim for malicious prosecution, the question of probable cause is one of law for the court." *Zahorsky*, 690 S.W.2d at 152 (citations omitted).

Apex asserted several causes of action against Advanced, Ball, and Linebarger in the Illinois Lawsuit. Plaintiffs argue the record supports a lack of probable cause for both Apex's breach of contract claim brought against Ball and Linebarger and the tortious interference claim brought against Advanced. Apex argues it is entitled to judgment as a matter of law because Plaintiffs cannot establish Apex lacked probable cause to bring the claims in the Illinois Lawsuit (or, stated differently, the undisputed facts demonstrate Apex *did* have probable cause to bring the claims against Plaintiffs in the initial lawsuit).

The undisputed facts show Ball and Linebarger were employed by Apex and worked in Apex's southwest region of Missouri (Ball, as the regional manager). While at Apex, both Ball and Linebarger were the primary points of contacts for Prime, and Ball was the primary contact for Tyson-Monett. Both Ball and Linebarger signed employment agreements prohibiting the personal use of confidential information (including as to "Referral Sources" and other company know-how and information). Moreover, Ball's employment agreement included a non-solicitation provision prohibiting him from soliciting or contacting Apex's Referral Sources (including existing and prospective referral sources the employee has had contact with or learned confidential information about) for two years after his employment with Apex ended. A "Referral Source" was defined in the agreement as "a person or entity which refers or can refer patients to Employer, such as a physician, a hospital, a physician assistant, a nurse practitioner, a nurse case manager, or a business."

Advanced was established in July 2016, in northwest Arkansas, approximately one month before Ball and Linebarger left Apex. In September 2016, only one month after Ball and Linebarger left Apex, Apex saw a testimonial on Advanced's website from Prime that was nearly identical to a testimonial Prime had written for Apex just a few months earlier. It is undisputed Apex considered Prime to be a "Referral Source" under the agreements. Plaintiffs do not show "how or why it would have been inappropriate for [Apex] to rely on these uncontroverted facts to support a reasonable belief that [Ball and Linebarger] might be found to have [breached their employment agreements]." *Vescovo*, 628 S.W.3d at 659. Having just left Apex and started Advanced in the same region where Apex planned to expand, it was apparent Ball and Linebarger

9

had had some contact with Prime since a testimonial from Prime appeared on Advanced's website. Apex had probable cause to believe Ball and Linebarger had breached the employment agreements at least as to Prime. *Cf. Brockman v. Regency Fin. Corp.*, 124 S.W.3d 43, 48 (Mo. Ct. App. 2004) (malicious prosecution defendant did not have probable cause to initiate breach of contract claim when it knew or should have known the sales contract was void because the certificate of title was not assigned).

Plaintiffs argue Apex did not have probable cause it had been damaged by Ball and Linebarger's contacts with Prime because the contract Apex had with Prime simply expired without a renewal and the reason Prime gave for not renewing the contract had nothing to do with Advanced or Ball and Linebarger. In the context of this malicious prosecution action, however, Apex need not establish it had actual knowledge it had been damaged, but only that it had probable cause to believe it had been damaged by the perceived breach of contract regarding Ball and Linebarger's contacts with Prime. The undisputed facts show Apex had probable cause or a reasonable belief it had been damaged by the perceived breach of the employment agreement as to confidential information (as related to Prime as a referral source and otherwise from employment at Apex). That Prime did not renew the contract is not the only basis for Apex's reasonable belief it had been damaged by Ball and Linebarger's perceived breach of the employment agreement. Additionally, Apex did not just seek monetary damages, but it also sought injunctive relief against Ball and Linebarger (as specifically provided for in the employment agreements Ball and Linebarger signed for actual or threatened breach of the agreement).

These facts would lead a reasonably prudent business to believe (1) its (recently) former employees had breached the confidentiality and non-solicitation provisions of their employment agreement, and (2) the former employer had been damaged by that breach including the non-renewal of the contract.

Plaintiffs also argue Apex did not have a reasonable belief that the non-solicitation and confidentiality provisions in the employment agreements were valid and enforceable. For instance, Plaintiffs state in their suggestions in opposition to Apex's motion for summary judgment: "Apex knew, because it was told prior to the filing of the lawsuit that the confidentiality provision was unenforceable." (*Id.* at 128-29.) Other than being wholly unsupported by the

record,[4] "[t]he enforceability of any restrictive covenant is a question of law." *Assoc. Ben. Serv., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (applying Illinois law). And even though the district court later held that the restrictive covenants were in fact not enforceable, in the context of a subsequent malicious prosecution claim, this is not dispositive. *See Impey*, 553 S.W.3d at 353 (citation omitted). Plaintiffs have presented no evidence sufficient to raise a genuine issue of fact for a jury to find Apex did not reasonably believe the provisions were unenforceable.

The Court is generally inclined to agree with Plaintiffs that a genuine issue of fact exists whether Apex reasonably believed the employment agreement provisions applied to Tyson-Noel and Tyson-Berryville (that is, whether Apex reasonably believed those facilities were "referral sources" as defined by the agreement and were "referral sources" that Apex had contact with two years prior to Ball and Linebarger's departure). Nonetheless, Apex is entitled to summary judgment on Count I in light of the forgoing in the context of this malicious prosecution action. Under the undisputed facts, Plaintiffs cannot establish Apex lacked probable cause to believe its breach of contract claim (in whole) was valid, regardless of the actual outcome of the claim. *See Impey*, 553 S.W.3d at 353 ("probable cause does not require that a plaintiff initiating a suit would have prevailed on its claim but instead only requires that a reasonable person have an honest belief that purs[u]ing the claim [was] proper") (citation omitted).

Because the Court finds that Plaintiffs cannot establish Apex lacked probable cause to initiate the Illinois Lawsuit as to the breach of contract claims against Ball and Linebarger, Apex is entitled to judgment as a matter of law on the entirety of Count I. *See, e.g., Vescovo v. Kingsland*, 628 S.W.3d 645, (Mo. Ct. App. 2020) (holding the trial court did not err in granting summary judgment in favor of defendants where plaintiff Vescovo could not establish the absence of probable cause for defendants to bring the claims asserted in the initial underlying federal lawsuit against the other five defendants (in addition to plaintiff Vescovo in his official capacity)).

Nonetheless, the Court will also consider Apex's other arguments. Apex also argues it is entitled to judgment as a matter of law because it had probable cause to assert the claim for tortious interference against Advanced in the Illinois Lawsuit. Apex asserted a claim for tortious

---

[4] In support, Plaintiffs cite only to an expert report prepared for this litigation that opines the restrictive covenants in the employment agreements were not enforceable and Apex could not reasonably believe they were enforceable. Neither the expert opinion nor Plaintiff's argument opposing summary judgment on this point appears to have any basis in fact, whether underlying the expert's opinion or in the summary judgment record now before the Court.

Case 6:20-cv-03043-RK   Document 206   Filed 11/16/21   Page 11 of 26

interference with a business expectancy against Advanced based on its solicitation (through Ball and Linebarger) of other Tyson facilities in the area including Tyson-Noel and Tyson-Berryville. (*See* Doc. 126-1 at 12.) Under Illinois law, a claim of tortious interference with business expectancy requires proof of: "(1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 993 (Ill. App. Ct. 2008) (citation omitted).

The undisputed facts in this case show Apex had a long-standing relationship with Tyson-Monett. When Ball worked at Apex, he was not only regional manager for southern Missouri where Tyson-Monett was located but was also Apex's main point of contact at this facility. Plaintiffs raise no genuine dispute as to any material fact from which a reasonable jury could conclude Apex lacked probable cause (that is, a reasonable belief in the facts and the claim) that it had a reasonable expectancy of entering into a valid business relationship with Tyson Foods generally or at least the Tyson-Noel facility. It is undisputed Apex planned to expand its operations in southern Missouri and northwestern Arkansas based on the regional presence of other Tyson facilities (given Apex's longstanding relationship with the Tyson-Monett facility). Regardless of the ultimate outcome in the Illinois Lawsuit (including the district court's conclusion that Apex did not have a valid expectancy sufficient to support a tortious interference claim), Plaintiffs have failed to raise any genuine dispute as to the material facts on which Apex argues it is entitled to judgment as a matter of law. Instead, Plaintiffs argue (without legal support) Apex is collaterally estopped from asserting an "honest and reasonable belief" in a business expectancy based on the district court's decision in the Illinois Lawsuit. This unsupported argument is not persuasive, however. The doctrine of collateral estoppel operates to prevent re-litigation of issues previously and finally decided on the merits between parties. *See, e.g.*, *Air Line Pilots Ass'n Int'l v. Trans States Airlines, LLC*, 638 F.3d 572, 579 (8th Cir. 2011). At a minimum, the operative issue in this case is not whether Apex *did* have a reasonable expectancy of a valid business relationship (the issue previously decided in the Illinois Lawsuit) but instead whether at the time the lawsuit was filed Apex had probable cause or a reasonable belief it had a claim for tortious interference with business expectancy against Advanced. And the undisputed facts in this case show Apex did have probable cause to assert the claim.

12

Plaintiffs also assert the undisputed facts show Apex only reached out to Tyson's Berryville and Noel facilities after Ball and Linebarger had left. Even if true, these facts do not establish Apex lacked probable cause or a reasonable belief its relationship with Tyson-Monett, interactions with Tyson's other regional facilities, and planned expansion into northwest Arkansas in light of the regional Tyson facilities, combined with Ball and Linebarger's contact with these Tyson facilities on behalf of Advanced reasonably supported a tortious interference with a business expectancy claim. Indeed, the undisputed facts establish Apex had probable cause to assert this claim for tortious interference against Advanced.[5]

For the reasons stated above, Apex's motion for summary judgment as to Count I is **GRANTED.**

## II. Count II – Abuse of Process

Apex also argues it is entitled to summary judgment on Count II, a claim for abuse of process. Apex argues it is entitled to judgment as a matter of law because the undisputed facts show Plaintiffs cannot establish that it misused the legal process in the Illinois Lawsuit or that Plaintiffs suffered special damages, as required by Illinois law for an abuse-of-process claim.

Under Missouri law a claim for abuse of process requires evidence to establish: "(1) the present defendant made an illegal, improper, perverted use of process, a use neither warranted nor

---

[5] Plaintiffs also argue Apex is not entitled to summary judgment because it did not have probable cause to believe the Illinois court could exercise personal jurisdiction over them. Plaintiffs cite no legal authority in support of this argument, nor is this argument persuasive. Advanced did challenge the personal jurisdiction of the Illinois courts in the initial proceeding – which the district court rejected. *See Apex*, 2017 WL 3923368, at *2-3 (S.D. Ill. Sept. 7, 2017). It does not appear Ball or Linebarger asserted a personal-jurisdiction challenge. In malicious prosecution claims, the existence of probable cause is conclusively established by "[a] judgment or finding in plaintiff's favor in the underlying proceeding." *Wolff*, 39 S.W.3d at 63 (citing *Ripley v. Bank of Skidmore*, 198 S.W.2d 861, 864 (Mo. 1947)). Under this rationale, Apex had probable cause to believe the Illinois courts had personal jurisdiction over Advanced, an issue conclusively decided in Apex's favor within the Illinois Lawsuit. Moreover, to the extent the Illinois Lawsuit was determined in Ball and Linebarger's favor, this outcome presumes and indeed rests on the court having jurisdiction over Ball and Linebarger. Plaintiffs provide no legal authority or support for their argument that a malicious prosecution claim may be brought on the basis of a lack of personal jurisdiction when the initial lawsuit was decided on the merits (rather than, for instance, being dismissed for lack of personal jurisdiction). At least one court has rejected the argument that lack of probable cause in a malicious prosecution action can be inferred from jurisdictional error such as lack of personal jurisdiction, even where the jurisdictional error was found to exist in the initial proceedings. *See Tomai-Minogue v. State Farm Mut. Auto Ins. Co.*, 770 F.2d 1228, 1237 (4th Cir. 1985) (applying Maryland law). The time to challenge the personal jurisdiction of the Illinois courts over Plaintiffs in the initial lawsuit was then, not now in a subsequent action for malicious prosecution after the initial litigation was decided on the merits.

13

authorized by the process; (2) the defendant had an improper purpose in exercising such illegal, perverted or improper use of process; and (3) damage resulted." *Nichols v. Harbor Venture, Inc.*, 284 F.3d 857, 861 n.4 (8th Cir. 2002) (quoting *Stafford v. Muster*, 582 S.W.2d 670, 678 (Mo. banc 1979)). "The essence of a claim for abuse of process is the use of process for some collateral purpose." *Vescovo*, 628 S.W.3d at 662 (citation and quotation marks omitted). A plaintiff's motives in pursuing a lawsuit are relevant only to the second element of an abuse of process claim (that is, "proof that use of process was employed for an improper purpose"); a plaintiff's motives are not relevant "to determining whether process was used in an unwarranted or unauthorized manner." *Id.* at 62-63. Stated differently:

> An abuse of process claim is not appropriate where the action is confined to its regular function even if the plaintiff had an ulterior motive in bringing the action, or if the plaintiff knowingly brought the suit upon an unfounded claim. It is where the claim is brought not to recover on the cause of action stated, but to accomplish a purpose for which the process was not designed that there is an abuse of process.

*Stone v. J&M Sec'y, LLC*, No. 4:20 CV 352 SPM, 2020 WL 5909788, at *8 (E.D. Mo. Oct. 6, 2020) (citation and quotation marks omitted); *see also Pipefitters Health & Welfare Trust v. Waldo R., Inc.*, 760 S.W.2d 196, 198-99 (Mo. Ct. App. 1988) ("It must be shown that process has been used to accomplish an unlawful end or to compel the defendant to do something which he could not be compelled to do legally. No liability attaches where a party has done nothing more than pursue the lawsuit to its authorized conclusion regardless of how evil a motive he possessed at the time.") (citation omitted); *Herring v. Behlmann*, 734 S.W.2d 311, 313 (Mo. Ct. App. 1987) ("the foundation of a suit for abuse of process is that the previous claim was brought for a collateral purpose") (citation omitted).[6]

---

[6] Under Illinois law, an abuse of process claim is established upon a showing (1) a plaintiff "possessed some ulterior purpose or motive, and (2) performed some act in the use of the legal process not proper in the regular prosecution of the proceedings." *Neil v. Nesbit*, No. 13-cv-03809, 2014 WL 4897315, at *4 (N.D. Ill. Sept. 27, 2014) (citation omitted). That is, a plaintiff must establish the proceedings were instituted "for an improper purpose, such as extortion, intimidation, or embarrassment" and that "the process was used to accomplish some result that is beyond the purview of the process." *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 930 (Ill. App. Ct. 2003) (citations omitted). "When process is used only for its intended purpose, there has been no misapplication of process." *Id.* (citation omitted). Even if, as Apex claims, Illinois law differs from Missouri law by requiring a showing of "special injury," *see also Neil*, 2014 WL 4897315, at *4, the Court need not undertake a choice-of-law analysis here, either, where there is no conflict as to the relevant issue – that is, whether process was used to accomplish an unlawful end or a result beyond the purview of the process.

14

Apex argues the undisputed facts fail to show it misused process to accomplish an unlawful or improper end because the "process" underlying Plaintiffs' claim – the summonses, subpoenas, and order appointing a process server – were used for their intended purpose.

Plaintiffs first argue the process was used to accomplish an unlawful purpose by forcing them to defend themselves in the State of Illinois, where the court could not properly exercise personal jurisdiction over them. Missouri law is clear that "there is no liability for abuse of process when a party has done nothing more than pursue a lawsuit to its authorized conclusion" and "'the action is confined to its regular and legitimate function in relation to the cause of action in the complaint,'" even if the plaintiff "'knowingly brought suit upon an unfounded claim.'" *Schlafly v. Cori*, __ S.W.3d __, 2021 WL 3729655, at *3 (Mo. Ct. App. 2021) (quoting *Wells v. Orthwein*, 670 S.W.2d 529, 532 (Mo. Ct. App. 1984)) (other citation omitted). "The difference between a claim for malicious prosecution and abuse of process is not the commencement of an action without justification but the misuse of process for an end other than that which it was designed to accomplish." *Diehl v. Fred Weber, Inc.*, 309 S.W.3d 309, 320 (Mo. Ct. App. 2010) (citation omitted). This argument is without merit.

The record in this case is devoid of evidence that would permit a jury to conclude Apex filed suit against Plaintiffs for an improper purpose. More importantly, even if the court had found it lacked personal jurisdiction, such finding does not itself satisfy either element of a claim for abuse of process. A case being dismissed for lack of jurisdiction or, as is the case here, the court rejecting a jurisdictional challenge and the case being resolved on its merits (indicating the court had jurisdiction over the parties), represents nothing more than the pursuit of a lawsuit to its natural conclusion; in either case, a conclusion entirely within the court's regular and legitimate function. Were Plaintiffs' argument correct, it would mean every time a court dismissed a cause of action for lack of personal jurisdiction, an abuse of process claim would lie. Clearly the law requires something more. *See Pipefitters Health*, 760 S.W.2d at 198-99. A tort claim for abuse of process is not an avenue through which a party can challenge personal jurisdiction of the initial court. This argument does not show Apex did anything other than "pursue the lawsuit to its authorized conclusion." Filing the lawsuit and pursuing it to summary judgment after Advanced challenged

15

personal jurisdiction (and lost) or waived it altogether by not raising it does nothing to demonstrate Apex filed the lawsuit to accomplish an improper collateral purpose.[7]

Second, Plaintiffs argue the subpoenas issued to third parties in this case were used to accomplish an unlawful end. Specifically, Plaintiffs argue, at the time the subpoenas were employed (and before some were issued), discovery had been limited to breach of the non-solicitation provision (by operation of the district court's first summary judgment order in favor of Ball and Linebarger, holding the confidentiality provision as unenforceable). Plaintiffs argue in support of summary judgment the persons and businesses to whom these subpoenas were directed only had discoverable evidence or information related to the confidentiality provision. Effectively, Plaintiffs assert the subpoenas were employed or issued regarding evidence that was, at that time, not discoverable. Apex argues, like the summonses, the subpoenas were issued in accordance with the law and procedures and were not used in a manner outside their designed purpose or use. The record is devoid of evidence – indeed Plaintiffs do not attempt to argue – the subpoenas were used in an unlawful manner to accomplish a collateral purpose outside the course of litigation. That Apex may have had an improper purpose to the extent that any one of these subpoenas were issued after the scope of discovery was limited to the non-solicitation provision of the employment agreements and any of the depositions then occurred is not enough without facts showing the subpoenas were used to accomplish some improper collateral purpose.

Therefore, Apex's motion for summary judgment as to Count II (Doc. 122) is **GRANTED**.

### III. Count III – Missouri Computer Tampering Act

Finally, Apex argues it is entitled to summary judgment on Count III of the Amended Complaint, asserting a claim under the Missouri Computer Tampering Act ("MCTA"). In Count III, Plaintiffs allege Apex violated the MCTA by accessing, examining, modifying, and taking data from Linebarger's email account, including a marketing log he had created, and taking and using Linebarger's password to access his email account.

---

[7] Plaintiffs' argument that, in the course of the ensuing litigation they were required to engage in exchange of discovery they would otherwise not have been required to produce to Apex fails for the same reason. Filing a lawsuit and pursuing it to its authorized conclusion (whether dismissal for lack of jurisdiction, judgment on the merits, etc.) and the incidents of such litigation, including discovery, do not, without something more, establish a claim of abuse of process. In essence, Plaintiffs' argument is not that Apex sought discovery from Plaintiffs for an improper purpose but simply that the discovery itself would not have occurred but for the lawsuit. In all civil cases, discovery exchanged may not ordinarily be obtained but for the civil lawsuit and the Federal Rules of Civil Procedure under which such discovery is had. A claim for abuse of process requires something more.

In the Amended Complaint in this case, Plaintiffs allege Apex produced in the course of discovery in the Illinois Lawsuit a marketing log Linebarger had prepared. Plaintiffs allege Linebarger had created the marketing log on his personal computer for Advanced and had emailed the marketing log only to Ball and his wife, Jaimie Ball. The Amended Complaint further alleges after the marketing log had been produced by Apex in discovery, Linebarger reviewed his email account and discovered his personal email account had been accessed, including the email to Ball and his wife containing the marketing log. Plaintiffs allege the email containing the marketing log had been forwarded on December 2, 2016, to an email address ("bsimpson80@gmx.com") which Linebarger was not familiar with, and that Linebarger had not forwarded the email himself.

The summary judgment record establishes that at some point, Linebarger prepared a marketing log on his personal computer documenting efforts he had made to introduce himself and Ball to businesses in northwest Arkansas. Linebarger forwarded the marketing log to Ball and Ball's wife at their "@advancedptonline.com" email addresses from his personal email account. On December 2, 2016, the marketing log was forwarded from Linebarger's email to another email address, "bsimpson80@gmx.com." Apex later produced the marketing log Linebarger had created in discovery conducted during the Illinois Lawsuit.

Section 569.095, RSMo, establishes "the offense of tampering with computer data" as: "knowingly and without authorization or without reasonable grounds to believe that he has such authorization:

(1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network; or

(2) Modifies or destroys data or programs or supporting documentation residing or existing external to a computer, computer system, or computer network; or

(3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; or

(4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network;

(5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person;

17

(6) Receives, retains, uses, or discloses any data he knows or believes was obtained in violation of this subsection.

Mo. Rev. Stat. § 569.095.1. Section 537.525 creates a civil cause of action for, in part, the violation of § 569.095 by "the owner or lessee of the computer system, computer network, computer program, computer service or data." Mo. Rev. Stat. § 537.525.1. The statute authorizes recovery of "compensatory damages, including any expenditures reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, computer service, or data was not altered, damaged, or deleted by the access." *Id.*

### A.  Standing as to Ball and Advanced to Assert a Claim under the MCTA

First, Apex argues it is entitled to summary judgment because neither Ball nor Advanced have standing to bring a claim under the MCTA. Apex argues Ball cannot establish standing because he is not an "owner or lessee" of Linebarger's private email account or the marketing log, which Apex also argues is not "data" under the MCTA. Apex also argues Advanced cannot establish standing because the marketing log is not "data" under the MCTA.

As defined under Missouri law, "data" in the context of the MCTA means "a representation of information, facts, knowledge, concepts, or instructions prepared in a formalized or other manner and intended for use in a computer or computer network," and includes "any form . . . as may be stored in the memory of a computer." Mo. Rev. Stat. § 556.061(21). In part, when data is modified, destroyed, disclosed, taken, received, retained, used or disclosed in violation of § 569.095, § 537.525 authorizes a civil lawsuit by the "owner or lessee of the . . . data."

As a document attached to an email, the marketing log is "intended for use in a computer or computer network" and is in a form that "may be stored in the memory of a computer." Apex argues in its reply brief, without citation, that Advanced cannot establish standing because "there is no evidence the marketing log was intended, *by Advanced*, for use on a computer or computer network." (Doc. 161 at 14.) This argument, presented without any citation to legal authority, bears little persuasive value in light of the statutory language set forth above. Whether something is "data" under the MCTA is independent from whether an individual person or entity is authorized to bring a civil lawsuit for a violation of the MCTA. Apex concedes Advanced is an "owner" of the marketing log created by Linebarger and emailed to Ball at his "@advancedptonline.com" email address. Advanced has standing to pursue a claim under the MCTA.

18

Apex also argues Ball does not have standing in his individual capacity to pursue a claim under the MCTA. This argument is also unpersuasive. Linebarger emailed the marketing log to Ball at his "@advancedptonline.com" email address. The email and its attached marketing log are "data" within the context of the MCTA. *See, e.g.*, *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 21 (Mo. banc 2012) (finding substantial evidence defendant violated the MCTA by deleting or copying "computer data" consisting of documents and emails from a computer). It is undisputed Linebarger sent the email and its attachment to Ball, Advanced's owner, at an email account, "@advancedptonline.com." The Court finds, viewing the evidence in a light most favorable to Plaintiffs and giving Plaintiffs the benefit of all reasonable inferences, Ball also has standing under the MCTA to assert a claim.

For these reasons, Apex's motion for summary judgment as to Count III based on Ball and Advanced's standing to assert a claim under the MCTA is **DENIED**.

### B.    Lack of Recoverable Damages under the MCTA

Next, Apex argues it is entitled to judgment as a matter of law because Plaintiffs present no evidence of *recoverable* damages under the MCTA. Apex asserts Plaintiffs' "sole theory of damages" for this claim is that but for Apex's discovery of the marketing log, it would not have filed the Illinois Lawsuit against Plaintiffs, and therefore Plaintiffs' damages are damages resulting from the Illinois Lawsuit itself. (Doc. 125 at 8.) Plaintiffs do not dispute this is its theory of damages. At a minimum, a question of fact exists as to the extent of the role the marketing log played in Apex's decision to file the Illinois Lawsuit against Plaintiffs. It is not the role of the Court at summary judgment to weigh the evidence and determine whether the marketing log caused or contributed to Apex's decision to file the Illinois Lawsuit against Plaintiffs. At a minimum, the record shows Apex obtained the marketing log shortly before the Illinois Lawsuit was filed and Steven Oravec (as corporate representative for Apex) testified the marketing log in particular formed the basis, at least in some part, for Apex's belief Plaintiffs breached a duty owed the company. (Doc. 151-10 at 24.)

Apex also argues it is entitled to summary judgment because the damages Plaintiffs seek are not recoverable under the MCTA. Section 537.525.1 authorizes recovery in a civil action for "compensatory damages." *See Roberts*, 367 S.W.3d at 20 ("Section 537.525.1 permits the owner or lessee of the computer system or network [or data] to bring a civil action . . . for any compensatory damages incurred and attorney's fees."). Apex argues Plaintiffs' theory of damages

as those connected to the subsequent Illinois Lawsuit (including attorney's fees expended in that initial lawsuit, lost profits, lost salary, and mental anguish, among others) is too attenuated from the alleged violation of the MCTA. Thus, to the extent the claim for compensable damages on which Plaintiffs' MCTA claim rests is wrapped up in the issue of causation, it is best left to a fact-finder to weigh the evidence and conclude whether (1) Apex violated the MCTA concerning the marketing log and (2) the marketing log caused Apex to file the Illinois Lawsuit against Plaintiffs. Because the MCTA allows for "compensatory damages," the Court finds the question of reasonable damages is best left to a jury.

For these reasons, Apex's motion for summary judgment as to Count III based on the damages Plaintiffs seek to recover under the MCTA is **DENIED**.

C.     **Lack of Evidence to Support Specific Damages**

Finally, Apex argues it is entitled to summary judgment on Count III because Plaintiffs have failed to (1) present admissible evidence Ball or Linebarger incurred attorney's fees and lost profits as a result of the Illinois Lawsuit, (2) establish Advanced's lost profits with a reasonable degree of certainty, and (3) present sufficient evidence to establish Ball and Linebarger suffered financial damages as a result of Advanced's payment of attorney's fees in the Illinois Lawsuit.

1.     **Ball and Linebarger's Claims for Damages of Attorney's Fees, Lost Profits, and Financial Damages**

First, there is no dispute that neither Ball nor Linebarger paid attorney's fees regarding the Illinois Lawsuit. Plaintiffs concede neither Ball nor Linebarger "seek recovery for those damages nor . . . of Advanced['s] lost profits." (Doc. 144 at 102.) Second, Apex argues Ball and Linebarger have failed to present sufficient evidence to establish financial damages they suffered because of Advanced's payment of attorney's fees regarding the Illinois Lawsuit including lack of pay increases, not taking a salary, and Ball's sale of land because of the expenses Advanced had to bear to defend against the Illinois Lawsuit.

Generally, "[t]he amount of damages is a question of fact." *Randy Kinder Excavating, Inc. v. J.A. Manning Constr. Co., Inc.*, 899 F.3d 511, 520 (8th Cir. 2018) (citing *High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.2d 493, 502 (Mo. banc 1992)). "Under Missouri law, the plaintiff [is] not required to prove the exact amount of his damages, but only to produce evidence which established [the fact of damages] with reasonable certainty." *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1121 (8th Cir. 2006) (citation and quotation marks omitted). Ball testified he had to

sell a parcel of land he owned to "keep the business afloat" because of the Illinois Lawsuit. (Doc. 36 at 15.) Additionally, Ball testified he was unable to take a salary during the pendency of the Illinois Lawsuit. (Doc. 17 at 15; *see also* Doc. 143 at 94, ¶ 258 (admitting this fact for purposes of summary judgment)). Finally, it is undisputed Linebarger testified he did not receive pay increases as quickly as he would have as a result of the financial burden of the Illinois Lawsuit on Advanced. (Doc. 143 at 94, ¶ 94.) Given the summary judgment record at this point, Apex's motion for summary judgment on Count III as to Ball and Linebarger's failure to present evidence as to certain claimed damages is **DENIED**.

### 2. Advanced's Claim for Damages of Lost Profits

Finally, Apex argues it is entitled to summary judgment on Count III inasmuch as Advanced seeks damages for lost profits. In support of Advanced's claim for lost profits resulting from the Illinois Lawsuit, Apex relies solely on expert testimony and an expert report prepared by Advanced's retained expert, Brittany Hopp. Hopp calculated the "value of damages to Advanced Physical Therapy LLC related to the lawsuit brought by Apex Physical Therapy LLC as of March 29, 2021," at $368,809. The parties appear to agree resolution of this argument on summary judgment turns on the admissibility of Hopp's expert testimony in light of a motion to exclude that Apex has filed under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 128). Advanced does not contest the only evidence as to Advanced's lost profits is Hopp's expert testimony. Accordingly, the Court will now turn to Apex's motion to exclude, which is fully briefed. (Docs. 129, 136, 153.)

Federal Rule of Evidence 702, amended after *Daubert*, provides the standard for the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Based on Rule 702, the Eighth Circuit relies on a three-part test to determine the admissibility of expert testimony:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic

rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prod. Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted). The rules for the admissibility of expert testimony favor admission over exclusion. *Id.*

Here, Apex challenges only the *reliability* of Hopp's expert testimony and report. "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion[8] and that the methodology underlying h[er] conclusions is scientifically valid." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758-59 (8th Cir. 2006). The traditional method for challenging the conclusions of an expert is through cross-examination. *Lipp v. Ginger C, L.C.C.,* 2017 WL 277579, at *14 (W.D. Mo. Jan. 19, 2017). "Attacks on the foundation of an expert's opinion and conclusions, and the completeness of the expert's methodology, go to the weight rather than the admissibility of the expert's testimony." *Id.* (citation and quotation marks omitted). However, expert testimony must be excluded when the opinion "is so fundamentally unsupported that it can offer no assistance to the jury." *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (citation and quotation marks omitted). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo*, 457 F.3d at 759.

After review of the motions and their supporting materials, the Court concludes that the reasoning and methodology underlying Hopp's methodology can be applied to the facts of this case. To calculate lost profits, Hopp reviewed Advanced's tax and financial records, including monthly income and expense data for each of Advanced's six locations (other than the Rogers, Arkansas, location). She calculated a monthly operating profit for each location by subtracting from that location's net income certain non-operating expenses (interest income, legal fees for the Illinois Lawsuit, and charitable contributions) for December 2016 (the first month of the Illinois Lawsuit) through March 2020 (a year after the lawsuit was concluded). The operating profit of each location (encompassing the particular location's opening and operating costs, as well as profits) was shifted to an earlier time based on when Advanced's Chief Financial Officer, Jaimie

---

[8] Apex does not argue Hopp is not qualified to render an expert opinion.

22

Ball, determined the location would have been opened but for the burden (financial and otherwise) of the Illinois Lawsuit.

This methodology seems to fairly encompass what Apex posits as the correct methodology for calculating lost profits in Missouri. (*See* Doc. 129 at 9) (citing *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 55-56 (Mo. banc 2005) (holding lost profits are generally calculated by deducting overhead expenses (including fixed and variable expenses; and in tort actions only variable expenses, not fixed expenses) from estimated lost revenues)). To the extent Apex challenges the completeness of Hopp's expert analysis, this is a topic to be pursued on cross-examination and is an issue that goes to the weight of her testimony rather than its admissibility.

Apex also argues Hopp's expert testimony is inherently unreliable due to her use of terminology that is more appropriate in a "business valuations" context than a litigious calculation of lost profits analysis. In addition, Apex points to Hopp's stated reliance on the Statement for Standards of Valuation Services that, Apex contends, by its terms does not apply when determining economic damages including lost profits. These are issues of credibility that go to the weight of Hopp's expert testimony, not its reliability or admissibility under *Daubert* and the Federal Rules of Evidence. This is particularly so because it does not appear the "standards" Hopp referenced and those Apex contends she should have referenced otherwise prescribe a particular methodology for calculating lost profits, but more so concern issues of professional responsibility. While a topic for cross-examination, this does not go to the admissibility of Hopp's expert testimony and report either.

Apex also argues Hopp's testimony should be excluded because it is not based on sufficient facts and data. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . [It is o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [that] such testimony must be excluded." *Children's Broadcasting Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) (citation and quotation marks omitted). Apex argues Hopp's expert testimony is fundamentally unsupported as a factual matter because she lacked sufficient data for Advanced's income and expenses prior to the lawsuit, her analysis rests on unsupported and unverified assumptions by Advanced that a location would have opened earlier but for the Illinois Litigation, and she failed to consider alternative explanations for Advanced's lost profits.

23

Generally, under Missouri law "anticipated profits of a commercial business are too remote and speculative to warrant recovery." *Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 918 (8th Cir. 2004) (citation omitted). Anticipated profits – or more accurately, based on Advanced's theory of damages here, profits that could have been received earlier but for Defendant's violation of the MCTA – "may be recovered when 'they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount.'" *Indep. Bus. Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 703 (8th Cir. 1997) (quoting *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968)) (other citations omitted). Generally, "'loss of profits' refers to the amount of net profits that the plaintiff would have realized in the usual course of business" but for defendant's unlawful actions. *Refrig. Indus., Inc. v. Nemmers*, 880 S.W.2d 912, 920 (Mo. Ct. App. 1994) (citation omitted). To recover, a plaintiff must establish (1) defendant's tortious conduct caused the lost profits, and (2) the amount or extent of the lost profits. *Id.*

Here, Advanced's theory of lost profits is not "forward-focused" in the sense that Apex's alleged tortious conduct caused Advanced to lose out on a future profit it otherwise would have obtained. Rather, Advanced's theory of lost profits is a "back-in-time" theory that, but for Apex's alleged tortious conduct in violating the MCTA (which, in turn, caused Apex to file the Illinois Lawsuit against Plaintiffs), it would have opened the other locations earlier thus receiving profits from the operation of those location earlier. In this way, the profits Advanced asserts it lost are not so much "anticipated profits" in the traditional sense, *see Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 893 (8th Cir. 2005) (noting the rule in Missouri "expected future profits may be extrapolated with reasonable certainty from historical evidence of the income and expenses of the business prior to the damaging event") (citing *Tipton*), but rather Advanced asserts as damages actually realized profits it could have earned (and been earning) earlier. The Court finds in the specific factual context of this case Hopp's expert testimony is not fundamentally unsupported because it does not rest on Advanced's income and expenses *prior to* the Illinois Lawsuit. Instead, Hopp's expert testimony rests on the actual profits each location earned after it had been opened, and to determine Plaintiffs' "lost profits" shifts them to an earlier time when, according to Advanced's Chief Financial Officer, the locations would have been opened but for the burdens of the Illinois Lawsuit.

Apex further argues Hopp's expert testimony is fundamentally unsupported because it relies on unsupported projections from Advanced's Chief Financial Officer, Jaimie Ball, as to

24

when each particular location or program would (or could) have been opened but for the Illinois Lawsuit. "An expert is permitted to rely on assumptions that are supported by the record." *Donner v. Alcoa Inc.*, 2014 WL 12600281, at *5 n.10 (W.D. Mo. Dec. 19, 2014) (citation omitted). Stated differently, "[a]n expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citing *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990)). "The district court must exclude expert testimony if it is so fundamentally unsupported that it can offer no assistance to the jury, otherwise, the factual basis of the testimony goes to the weight of the evidence." *Meterlogic*, 368 F.3d at 1019 (citation and quotation marks omitted).

The factual assumption on which Hopp's lost-profits analysis admittedly rests is the point in time at which Advanced would have opened the other locations and programs but for the burdens (financial and otherwise) of the Illinois Lawsuit (itself a product of Apex's alleged violation of MCTA). Hopp indicated in her deposition testimony that she relied on projections from Advanced and looked only for a positive – or more specifically a "not negative" – cash flow for the company at the given projected time in performing her analysis. For support in the record, Advanced points to deposition testimony by Jaimie Ball, Advanced's Chief Financial Officer. Jaimie Ball testified at her deposition that, at least for a few of the locations, she looked at the cash flow that existed (taking out the attorneys' fees for the Illinois Lawsuit) and whether it would have been possible to open those locations at that time but for the Illinois Lawsuit cost.[9] (*See* Doc. 136-10 at 8-10.) Hopp testified she did a "reasonableness check" on these assumptions based on what Jaimie Ball told her the earlier opening timeframe would have been, the cash flow that existed at that time, and the expense of opening the particular location.

"[A party]'s mere disagreement with the assumptions [on which the analysis is performed or the assumptions underlying the expert's opinion] . . . does not warrant exclusion of expert testimony." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) (citing *Daubert*, 509 U.S. at 596) (other citation omitted). The underlying assumptions on which Hopp's expert opinion and report are based – particularly, Jaimie Ball's determination as Chief Financial Officer when

_____

[9] For other locations, Jaimie Ball testified only speculatively when they would have opened earlier but for the time and emotional burdens of the Illinois Lawsuit, as well as the opening of other locations that were not impacted by the burdens of the Illinois Lawsuit. Nonetheless, the question at this stage is not a matter of quantifying a specific amount of lost-profits damages Advanced may or may not ultimately be entitled to, but whether it has presented evidence of some amount of lost-profits damages.

25

specific locations would have opened earlier but for the burdens of the Illinois Lawsuit – are certainly a topic for cross-examination and adversarial testing at trial. The Court does not find, however, that Hopp's reliance on Jaimie Ball's analysis (which is supported by deposition testimony in the record) renders her expert testimony and expert opinion so fundamentally unsupported that it would offer no assistance to the jury. *Cf. US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 691 (8th Cir. 2009) (holding district court did not abuse its discretion in excluding expert testimony as to a company's lost profits that relied on "speculative estimates" provided by the company's president in deposition that he had been given "different estimates" as to the volume of salt the customer expected to buy from the company, admitted he had "no way of verifying those estimates" until he started production, and "testified that he was not able to obtain a written commitment from any customer regarding how much they would pay for solar salt").

Finally, to the extent Apex argues Hopp's analysis must be excluded because she did not consider alternative explanations for Advanced's lost profits, the Court notes Hopp's expert report and testimony opine on the amount of lost profits Advanced suffered, rather than whether the Illinois Lawsuit *caused* Advanced to suffer lost profits (a key assumption on which her analysis necessarily relies).

For the reasons explained above, Apex's motion to exclude the expert testimony of Hopp (Doc. 129) is **DENIED**.

Because Hopp's expert testimony is not excluded at this time, Apex's motion for summary judgment as to Count III based on the evidence Advanced has presented to prove its claim for lost profits is without merit and is **DENIED**.

### Conclusion

Accordingly, for the reasons above, it is **ORDERED** that (1) Defendant's motions for summary judgment as to Counts I and II (Docs. 120, 122) are **GRANTED**; (2) Defendant's motion to exclude expert testimony of Brittany Hopp (Doc. 128) is **DENIED**; and (3) Defendant's motion for summary judgment as to Count III (Doc. 124) is **DENIED**.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: November 16, 2021